## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**EURIKA STEMLEY**                       **CIVIL ACTION NUMBER: 15-4596**
                **Plaintiff**

**VERSUS**                              **SEC:**    **MAG:**

**GREIF, INC; ROBERT STEWARD**           **JURY TRIAL REQUESTED**
        **Defendants**

## COMPLAINT FOR DAMAGES PURSUANT TO TITLE VII; LSA R.S. 23:301, *ET. SEQ.*; LSA R.S. 2315; LSA R.S. 2320; AND LSA R.S. 30:2027

### PLAINTIFF

1.  Plaintiff Eurika Stemley is of full age of majority, competent, and residing in St. John the Baptist Parish, Eastern District of Louisiana.  At all times relevant to the allegations of this complaint, Plaintiff was employed as a lab technician and field operator with Greif, Inc.

### DEFENDANT

2.  Defendant Greif, Inc. is, on information and belief, a Delaware Corporation with its principal place of business in the State of Ohio and its registered principal business establishment in Louisiana located in the Parish of East Baton Rouge,

1

State of Louisiana.  Greif also has numerous satellite locations, including a site in St. Rose, Louisiana, where, at all times relevant hereto, Plaintiff was employed.[1]

3.  Robert Steward, competent, and of full age of majority, is believed to be a citizen of the Eastern District of Louisiana.  At all times relevant to Plaintiff's whistleblower and IIED claims alleged herein, and for the greater part of the Title VII discrimination and retaliation claims alleged herein, Steward was Plaintiff's supervisor and the manager of Greif's St. Rose location.

## VENUE & JURISDICTION

4.  Venue & Jurisdiction are proper before this Honorable Court pursuant to 28 USC §1332; 28 USC §1331; and 28 USC §1367.

## ADMINISTRATIVE EXHAUSTION

5.  Plaintiff has exhausted all administrative requirements of 42 USC §2000e, in bringing claims for discrimination based on gender/disparate treatment and retaliation: she filed her charge within three hundred days of the last

---

[1] Plaintiff's employment commenced with Delta Petroleum Company, which was acquired by Greif, Inc., in 2006.

discriminatory act; received a right to sue letter on or about August 11, 2015, and filed suit within ninety (90) days of receiving her right to sue letter.

### CONTINUOUS TORT

6.  Plaintiff specifically alleges that the continuing tort doctrine applies to the discriminatory conduct complained of herein.

### STATEMENT OF FACTS

7.  Plaintiff's employment with Greif, Inc. commenced February 8, 2008, as a prep material handler, earning $10/hour.

8.  After two years, Plaintiff moved to the repack area in the warehouse, earning $10.50/hour; approximately one year later, Plaintiff moved to the field unit, as a field operator, earning $14.50/hour.

9.  Sometime in 2013, Plaintiff moved from field operator to the lab, and began working as a lab technician, earning $15.50/hour.

10. Shortly thereafter, Plaintiff became a lead, overseeing the lab and the field unit and supervising three people, all males.  At this time, her hourly salary was $17.50.

11. Shortly after assuming the lead position in 2013, James Manshach, a

3

black male who was among the three males Plaintiff was responsible for

supervising, began repeatedly remarking to Plaintiff that she needed to leave the

job.  He told her she was "out of her place" in a field of men.  He said she could

never "lead" men; and he refused to take any orders from Plaintiff.

12. Manshach made these and similar remarks about Plaintiff's status as a

woman and his unwillingness to take orders from her, because she was a woman,

on a daily basis.

13. True to his word, when Plaintiff gave Manshach orders, he did not follow

them.

14. Plaintiff initially reported Manshach's conduct to Chateau Miller, then

plant manager of Greif's St. Rose location.

15. Miller stated that he would "talk to" Manshach.

16. Manshach persisted in remarking that Plaintiff was "out of her place"

among men and could never "lead" men; he also continued to refuse to follow

Plaintiff's directives.

17. Sometime in February 2014, Chateau Miller transferred from Greif's St.

Rose location, and Robert Steward was hired as plant manager.

18. Plaintiff again reported Manshach's conduct, this time to Robert Steward.

19. Steward conducted a meeting of Plaintiff and the three men she supervised: Manshach, Corey Robertson, and Khich Phat.

20. Manshach stopped making remarks about Plaintiff being out of her place among men for one day.  After that one day, the behavior began again; he also continued to refuse to follow Plaintiff's directives.

21. Sometime in March 2014, as a result of Manshach's persistent comments about her status as a woman, his unwillingness to take directives from her because she is a woman, and management's failure to do anything about Manshach's conduct, Plaintiff went to Steward and asked to be removed as lead but to be allowed to maintain her assignment to the lab.

22. Steward promised Plaintiff he would hire someone to take over the lead position.

23. Two months later, on or about May 19, 2014, Steward hired Devon McDonald as a lab technician.

5

24. Steward directed Plaintiff to train McDonald.

25. Plaintiff trained McDonald from May 19-30, 2014.

26. Steward subsequently moved Plaintiff to the warehouse and cut her pay from $17.50/hour to $15.50/hour.

27. Other male employees of Greif, Inc., have, upon moving out of the lead position, retained their salaries and have not been subject to a pay cut.[2]

28. McDonald took over the lead lab position on June 1, 2014.

29. Plaintiff immediately observed that Steward allowed McDonald, in his position as lab lead, to bypass Chevron procedures for offloading tank trucks and drumming.

30. Chevron is a customer of Greif that has environmental quality procedures in place which govern offloading tank trucks and drumming.

31. Part I of the procedures requires Greif employees to (1) obtain an

---

[2] Albert Barrier is one of the men who retained his pay; Plaintiff does not recall the last name of the other male, but knows his first name to be Clarence.  Plaintiff also knows of male employees at Greif's Metairie location who have moved from the lab to the warehouse and retained their pay rate (i.e., their pay was not cut).

6

"inbound" sample from the tank truck; (2) transfer the inbound sample to the lab for testing for approval within the range of Chevron's Certificate of Analysis for a given product; and (3) notify  field operators when they can unload the tank truck once the sample tests within the certified range.

32. One of the purposes of these tests is to insure that Chevron products are not contaminated upon arrival.

33. Part II of the procedure requires Greif employees to test the first and second drums, upon the drums being filled.

34. Samples are pulled from these drums and barcoded; the samples are then sent to the lab for testing.

35. While these samples are being tested, Greif employees are not permitted to fill anymore drums.

36. Plaintiff observed that Steward was allowing McDonald to bypass Part II of the procedures.

37. Bypassing Part II of Chevron's procedure caused a false register of production, specifically, it artificially increased production numbers.

7

38. Shortly before moving Plaintiff to the warehouse from the lab, Steward had complained that Plaintiff's production numbers were not high enough.

39. Sometime in mid-June 2014, Plaintiff told McDonald that he was not following Chevron procedure and needed to follow proper procedure.

40. McDonald stated that he knew he wasn't following procedure and that Steward told him to bypass procedure to get the numbers up so that Greif would not lose Chevron's contract.

41. Within days of Plaintiff informing McDonald that he was not, but should be, following Chevron procedure, Plaintiff received a performance evaluation from Steward.

42. The evaluation addressed Plaintiff's work on forklift and did not consider work she had done in the lab.

43. At that point, Plaintiff was not even working on forklift and was working in the warehouse.

44. Steward gave Plaintiff an unsatisfactory performance evaluation.

45. Up to that point, Plaintiff had not received an adverse performance

8

evaluation during her employment with Greif.

46. A few days later, Larry McGee, a lead in the warehouse, questioned Manshach about McDonald's production numbers as lead in comparison with Plaintiff's production numbers as lead.

47. Manshach responded: "Man, they got us bypassing Chevron procedures back there."

48. On or about June 30, 2014, Larry McGee instructed Plaintiff to go back to the lab, because, as of June 30, 2014, McDonald was promoted to the position of shipping office coordinator.

49. Plaintiff returned to the lab; upon arrival, Manshach told Plaintiff: "Now that you are back, I am going to make your job even worse."

50. For the entire month of July 2014, Manshach taunted Plaintiff and refused to follow any of Plaintiff's directives.

51. On July 20, 2014, Manshach had a spill in the offload area.

52. Prior to July 20, 2014, Manshach had numerous spills in the offload area, but was never disciplined.

9

53. As a result of the July 20, 2014 spill, Steward suspended Manshach.

54. Plaintiff reported to Steward that the field unit was understaffed as a result of Manshach's suspension.

55. Steward ignored Plaintiff's report.

56. On or about July 23, 2014, Plaintiff reported to the lab at approximately 7:00am.

57. At approximately 7:45am, McDonald arrived and informed Plaintiff that he was going to be working in the lab and instructed Plaintiff to return to the field to offload tank trucks.

58. At approximately 8:00am, McDonald began training Devon Skype, a new employee in the lab.

59. Plaintiff logged in two (2) of four (4) trucks scheduled for offloading that day,[3] but did not run any samples on them, because McDonald reported to the lab and stated that he was going to work the lab for the day.

_____

[3] It is necessary to log in the trucks so that labels and work orders can be created.

10

60. Plaintiff logged out of the system.

61. McDonald logged in.

62. Khich Phat pulled inbound samples from the first and second tank trucks.

63. McDonald tested these samples and approved them.

64. Plaintiff began prepping the drums for the second tank truck.

65. Upon finishing, Plaintiff began drumming the second tank truck.

66. Khich Phat filled two drums and, in violation of Chevron procedure, kept drumming, without stopping after the second drum to pull samples.

67. Plaintiff finished the second drum and, in accordance with Chevron procedure, stopped to pull samples.

68. Plaintiff sent the samples to the lab, and McDonald approved them.

69. Plaintiff continued filling drums.

70. Khich Phat, who never stopped filling the drums to pull and test samples after drum two, finished the last drum, then pulled a sample.

71. Khich Phat then began flushing the fill line from the tank truck to the pumps.

72. A third Chevron truck arrived, containing OLOA 275JD.

73. Khich Phat obtained an inbound sample from this third truck.

74. He sent the sample to the lab.

75. McDonald tested the sample.

76. McDonald proceeded to the field where Plaintiff was still offloading the 2nd truck.

77. McDonald asked Plaintiff if she could assist him with the sample from the 3rd truck, because he was not obtaining a good test.

78. Khich Phat began unloading the truck that Plaintiff had been unloading.

79. Plaintiff went to the lab and McDonald went to the warehouse, claiming that he needed to do something at his desk.

80. Plaintiff tested the inbound sample from truck #3 and did not obtain a result within the required range of viscosity.

81. Because it was raining, Plaintiff asked Khich Phat to obtain a sample from the bottom of the truck, first, by filling a 5-gallon pail, and then obtaining a sample after "draining off".

82. This process of "draining off" is within Chevron procedure, because the top of the truck cannot be opened when it is raining.

83. Plaintiff tested the sample again, and the sample tested within the approved viscosity range.[4]

84. Because Plaintiff was not logged in, Plaintiff wrote the reading on a sticky note and placed the sticky note on McDonald's paperwork.

85. Plaintiff gave Khich Phat the reading; Khich Phat stated he was exhausted and that he was taking his lunch break.

86. Plaintiff went to McDonald and reported the procedure she followed and that she obtained a passing sample.

87. McDonald stated that he was going to call Steward and report that the 3rd tank truck was good.

88. Upon returning from his lunch break, Khich Phat began offloading the 3rd truck.

---

[4] The reading was 87.16, and the maximum on the Certificate of Analysis is 87 with a variance of 5 percent.

89. He bypassed Chevron procedure again and did not stop drumming after filling the second drum.

90. McDonald and Steward returned to the area: Steward went to the lab and McDonald went to the fill unit to pick up samples from drums one and two of the 3rd truck.

91. At this point, Khich Phat was on drum sixty-nine.[5]

92. Plaintiff then heard McDonald call her name and direct her to report to the lab.

93. Upon arrival, Steward asked Plaintiff how she obtained her inbound sample reading.

94. He told Plaintiff that she was out of range, because drums 1 and 2 of truck #3 tested out of range.

95. Plaintiff denied doing anything in violation of Chevron procedure and

---

[5] Chevron questioned how Greif could have gotten to drum 69, if testing of drums 1 and 2 failed. Furthermore, documentation will show that Steward identified the inbound sample that Plaintiff tested as the only one that met certificate of analysis viscosity requirements.  In addition, documentation will show that McDonald approved the inbound sample in the system.

reminded Steward that a five percent variance was/is permissible.

96.Steward instructed Plaintiff to go back to the fill unit and continue doing

what she was doing.

97.At the end of the day, McDonald instructed Plaintiff to report to Steward's

office.

98.Upon arrival, Steward instructed Plaintiff to write a statement.

99.After Plaintiff wrote a statement, Steward told Plaintiff he would have to

"treat [her] the same way he treated James Manshach."

100.    Steward suspended Plaintiff; the same day Plaintiff was suspended,

Steward called Manshach to return to work.

101.    Manshach stated he already had plans for the rest of the week and

did not return to work until several days later.

102.    Three days after Steward told her she was suspended, Plaintiff

contacted Greif Human Resources in Chicago; the Chicago Human Resources rep

instructed Plaintiff to contact Jody Dempster, HR rep for Greif's St. Rose location.

103.    Ms. Dempster informed Plaintiff that she had no idea Plaintiff had

15

been suspended.

104.     Plaintiff subsequently contacted her union representative, Barry

Kaufman.

105.      On or about July 31, 2014, Plaintiff filed a grievance in which she

stated that she had done nothing wrong, complained about being treated

differently from similarly situated employees, and asked to be called back to work

immediately.

106.     On or about August 4, 2014, Plaintiff received a letter of termination

from Greif signed by Robert Steward.

107.     On or about August 5, 2014, Kaufman contacted Plaintiff and advised

that neither Steward nor the general manager of all Greif Louisiana plants (Ian

Boyd) wanted Plaintiff to return to Greif.

108.     Plaintiff filed for unemployment benefits with the Louisiana

Workforce Commission on or about August 5, 2014 and received benefits in the

amount of $220/week for approximately six (6) weeks.

109.     On or about August 7, 2014, Plaintiff filed a second grievance in

which she requested reinstatement immediately; payment of all lost wages; and fair treatment in comparison with her counterparts.

110.     Sometime between August 7, 2014 and September 2, 2014, Plaintiff stopped receiving unemployment benefits and learned that Greif was contesting her unemployment benefits.

111.     On or about September 2, 2014, Plaintiff filed a notice of appeal.

112.     On or about September 10, 2014, Plaintiff received notice of an administrative hearing on her appeal which was scheduled to take place September 23, 2014.

113.     During the hearing, Defendant's reps stated that Plaintiff cost Greif $78,000 as a result of her improperly testing the inbound sample from truck #3.

114.     On information and belief, Greif actually sold all of the product that it claimed was "bad" and the company suffered no financial loss in connection with alleged bad reporting by Plaintiff.

115.     In the administrative hearing, Greif reps also falsely reported that

McDonald was supervising Plaintiff's work and did not acknowledge that he was, in fact, logged in as the lab technician on duty, at the time he asked Plaintiff to test the inbound sample from truck #3.

116.    On or about September 26, 2014, Kaufman subsequently reported that a collective bargaining "last and final chance" agreement had been reached in connection with Plaintiff's second grievance, specifically, Plaintiff could return to work, but she would be placed on ninety (90) days of probation and would not be able to discuss her case with any other employees.

117.    Plaintiff refused to sign the "last and final chance agreement" with Greif, because doing so would result in her admitting to offenses and violations that she did not commit and forcing her to remain silent about other employees' and supervisors' breaches of environmental quality procedures.

118.    Negotiations continued and  Greif stated that it would not require Plaintiff to be on probation and that she could return to work on October 22, 2014, however, she would return in the "last step of the progressive discipline process."

119.     Plaintiff did not return to Greif on October 22, 2014, because the condition that she return in the "last step of the progressive discipline process" would still make her accountable for violations and offenses she did not commit.

120.     Sometime on or about October 14, 2014, Plaintiff filed a charge of discrimination with the EEOC.

121.     Plaintiff alleged that she was discriminated and retaliated against based on her gender/sex, and in support of these claims described the numerous occasions on which she had been harassed and intimated on the job by her male subordinates, with her supervisors' knowledge and without any corrective action being taken.

122.     Plaintiff further described being treated differently and unfavorably from men on the job and being replaced by a man, after being falsely accused of failing in her job performance.

123.     Plaintiff received a second termination letter from Greif on or about October 31, 2014.

124.     Plaintiff received a right to sue letter from the EEOC on August 11,

2015.

## CAUSES OF ACTION

125.     Plaintiff re-alleges paragraphs 1-124.

### Count 1.  Title VII and LSA 23:301, *et. seq*. (hostile workplace; disparate treatment; retaliation)

126.     Plaintiff is entitled to relief against Grief, Inc. as a result of the

discrimination to which she was subjected, based on her gender, while working as

lead in the lab.

127.     Plaintiff twice complained to supervisors about Manshach's blatantly

sexist remarks to her; claims that he would not take directives from her; and

refusal to follow any job-related commands she directed to him in her position as

lead, because she is a woman.  Plaintiff's supervisors took no prompt action to

investigate and correct the discriminatory behavior.

128.     The single meeting that Steward had with Manshach, Plaintiff, and

two other workers under Plaintiff's supervision paid nothing more than lip-service

to the hostility of the environment in which Plaintiff was required to work, based

on her gender, as evidenced by the fact that Manshach stopped making sexist

remarks and refusing to follow Plaintiff's directives, because she is a woman, for a

single day only. Without the reproach of supervisors and managers above

Plaintiff, Manshach renewed denigrating Plaintiff because she is a woman and

refusing to take any directives from her, because she is a woman, after that single

day.

129.    Plaintiff is entitled to relief against Greif, Inc., as a result of the

disparate treatment to which she was subjected by Greif, upon moving from lead

in the lab back to the warehouse and upon ultimately being terminated.

130.    Plaintiff did not want to leave the lead position and only sought to be

taken out of the position, because of Manshach's daily harassment of her, which

she reported, but which went unchecked by upper management.

131.    Steward directed Plaintiff to train her replacement as lead then

demoted her, by moving her from the lab to the warehouse and cutting her pay.

132.    Male Greif, Inc., employees situated similarly to Plaintiff and who,

like Plaintiff, left lead positions in the lab, have not been relegated to the

warehouse, nor have they had to take pay cuts.

133.     Plaintiff is entitled to relief against Greif, Inc., for retaliation to which she was subjected as a result of complaining about Manshach's sexist and insubordinate behavior to Steward.

134.     Within weeks of complaining about Manshach, Steward demoted Plaintiff, relegating her to the warehouse and cutting her pay from $17.50 to $15.50, despite the fact that similarly situated male Greif employees have left lead positions and not had to take paycuts.

135.     Further, after Plaintiff was falsely accused of failing to properly test samples, Steward told Plaintiff that he would have to treat her the same way he treated Manshach; yet, unlike Manshach, Plaintiff did not engage in any conduct that violated any environmental safety laws, or policies, or any of Chevron's environmental quality procedures.

136.     Also, Plaintiff ultimately lost her job, while Manshach was only suspended, despite having previously had several spills.

137.     Further, Steward asked Manshach to report back to work on the very

day that Plaintiff was suspended because of Steward's false allegations and

permitted Manshach to delay his return, because of conflicts with personal affairs

he scheduled while on suspension.

**Count 2. LSA R.S. 30:2027 (whistleblower, environmental protection)**

138.      Plaintiff is entitled to relief against Greif, Inc., because Greif, through

its agent employee Steward, retaliated against Plaintiff for telling McDonald that

he was bypassing Chevron's environmental quality procedures for collecting and

testing samples, and for re-urging her complaint that procedure was being

violated after McDonald told her that Steward instructed him to bypass

procedure.

139.      Within weeks of Plaintiff complaining to McDonald about  bypassing

Chevron procedure, Steward gave Plaintiff a poor performance evaluation based

on a job duty/assignment—forklift—that she had not had in years.

140.      Prior to this poor performance evaluation, Plaintiff's personnel

record was void of any adverse performance evaluations or disciplinary actions.

141.      Within weeks of complaining about McDonald bypassing Chevron

procedure, Steward falsely accused Plaintiff of violating Chevron procedure and causing Greif to suffer a $78000.00 loss.

142.    Greif suffered no financial loss, because the product it claimed was unusable, because of Plaintiff's alleged testing error, was actually sold to Chevron.

143.    Greif caused Plaintiff to suffer financial loss as a result of falsely accusing her of violating Chevron procedure, by relating false information to the Louisiana Workforce Commission about the cause of Plaintiff's termination, which resulted in her unemployment benefits ceasing, and, ultimately, by terminating Plaintiff's employment and blemishing her employment record, based on false accusations.

144.    Plaintiff twice reported breaches of Chevron procedure to McDonald and, throughout the events of July 23, 2014, followed Chevron procedures, even as she observed others (Khich Phat) continuing to violate those procedures, without reproach.

145.    Despite Khich Phat's indisputable violations, which Chevron pointed

out to Greif, Inc., Plaintiff was blamed for the production of allegedly bad product and, ultimately, loss her job.

146.     Yet the allegedly bad product that Plaintiff's allegedly erroneous sampling yielded was purchased by Chevron, causing no financial loss to Greif, Inc.

**Count 3.  LSA R.S. 2315 (intentional infliction of emotional distress)**

147.     Defendant Robert Steward is personally liable unto Plaintiff for intentional infliction of emotional distress.

148.     Steward knowingly falsely accused Plaintiff of violating Chevron's environmental quality procedures in full knowledge that she did not generate a sample test that fell outside of Chevron's deviation range and in full knowledge that he sanctioned procedural breaches by McDonald and other male employees situated similarly to Plaintiff, as a means of increasing Greif's production numbers.

149.     Despite knowing that Plaintiff did not, and would not, breach procedure, Steward laid sole blame for the allegedly erroneous sample test and alleged financial loss to Greif at Plaintiff's feet.

25

150.     Steward's false accusations, caused Plaintiff to suffer severe

emotional distress, including sleeplessness, loss of appetite, and nightmares.

151.     Louisiana and our nation as a whole have put safeguards in

place to hold industry accountable to protecting the environment; Steward's false

accusations against Plaintiff, in full knowledge that she complained about

environmental quality procedural violations that Steward actually sanctioned, is

outrageous and reckless conduct.

### Count 4: LSA C.C. Art. 2320 (vicarious liability)

152. Greif, Inc., is vicariously liable for the injuries Steward personally caused

Plaintiff to sustain, because Greif, Inc. employed Steward and upheld him in

falsely accusing Plaintiff of violating Chevron's environmental quality procedures

and retaliating against Plaintiff for reporting violations of Chevron's

environmental quality procedures.

153. Defendants' actions, in falsely accusing Plaintiff of violating Chevron's

environmental quality procedures were reckless and intentional and subjected

Plaintiff to severe and extreme emotional distress, which was foreseeable.

154. Greif, Inc., through Steward also behaved maliciously, willfully, wantonly, and in reckless disregard for Plaintiff's federal rights under Title VII to be free from a hostile workplace environment based on her gender.

155. The acts and omissions of Defendants as described herein were also done with negligence, gross negligence, and/or intent, in violation of Plaintiffs' rights under federal law and under Louisiana statutory and constitutional law.

156. Defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting, committing, and/or ratifying and condoning the commission of the above described acts and/or omissions.

**DAMAGES**

157. Plaintiff suffered wage loss (back and front pay), special, and general damages in excess of $75000 for the following:

 a.  Extreme mental anguish and emotional distress as a result of being subject to a hostile working environment based on her gender;

b. Extreme mental anguish and emotional distress as a result of being retaliated against for complaining about being discriminated against because of her gender;

c. Extreme mental anguish and emotional distress as a result of the intentional infliction of emotional distress to which Robert Steward subjected Plaintiff;

d. Extreme mental anguish and emotional distress as a result of being falsely accused of violating Chevron environmental quality procedure and causing Greif to suffer a financial loss;

e. Extreme mental anguish and emotional distress as a result of being retaliated against for complaining about Greif supervisors sanctioning violation of Chevron environmental quality procedure as a means of artificially boosting production numbers;

f. Treble damages for being retaliated against for complaining about violations of Chevron's environmental quality procedures; and

g. Attorney fees and costs associated with litigating this matter.

158.  Plaintiff requests a trial by jury.

**PRAYER FOR RELIEF**

159.  Wherefore, Plaintiffs pray that after due proceedings there be judgment in

her behalf and against all defendants jointly, severally, and *in solido*, as follows:

1.  Back and future lost wages;

2.  Compensatory, special, general, and treble damages;

3.  The cost of this action and reasonable attorney fees, as provided by Title VII

    and LSA R.S. 30:2027;

4.   Judicial interest from the date of judicial demand;

5.  Trial by jury; and

6.   Such further relief as this Court deems just and equitable.

    Respectfully submitted this 22nd day of September, 2015.

    **/s/Nghana Lewis Gauff**
    _____
    Nghana Lewis Gauff, 31407
    425 W Airline Ste N  LaPlace, LA 70068
    (985) 224-8097; (985) 224-8237, Fax
    nlglawfirm@bellsouth.net

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Complaint with pleadings and exhibits

will be served by process server within the time delays prescribed by law, upon

the following individuals:

Greif, Inc.
through its registered agent
CT Corporation System
8550 United Plaza Boulevard
Baton Rouge, LA 70809

Robert Steward
through Greif's registered agent
CT Corporation System
8550 United Plaza Boulevard
Baton Rouge, LA 70809

**/s/ Nghana Lewis Gauff**
Nghana Lewis Gauff, 31407
Plaintiff's Attorney

30